UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NABIL NAGI,                                    Case No. 2:23-cv-
                                               HON.
            Plaintiff,                         MAG. JUD.

vs.

SCHOOL DISTRICT OF THE CITY OF
HAMTRAMCK PUBLIC SCHOOLS,
JALEELAH HASSAN AHMED, SALAH
HADWAN, JIHAN AIYASH,
and DAZ'SHAVON HALL,
individually and in their official capacities,
and jointly and severally,

            Defendants.

_____

GARY T. MIOTKE (P41813)
Attorney for Plaintiff
6828 Park Avenue
Allen Park, MI 48101
(313)-388-4809
gmiotke@miotkelawoffice.com


_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the Plaintiff, by and through his attorney, and for his

Complaint he states that:

## JURISDICTION, PARTIES, VENUE

1. This action arises out of the Plaintiff's employment.

1

2. Count I is an action to enforce civil rights pursuant to 42 USC 1983.  This Court has jurisdiction over Count I pursuant to 28 USC 1331 and 28 USC 1343(a)(3) and (4).

3. This Court has jurisdiction over Count II and Count III by virtue of the doctrine of supplemental jurisdiction, 28 USC 1367.

4.  Plaintiff is a resident of the City of Dearborn, County of Wayne, State of Michigan.

5.  Defendant, SCHOOL DISTRICT OF THE CITY OF HAMTRAMCK PUBLIC SCHOOLS ("HPS") is a school district that exists by virtue of the laws of the State of Michigan within the Eastern District of Michigan, Southern Division.

6.  Defendant, JALEELAH HASSAN AHMED ("AHMED") is a resident of a municipality that exists within the Eastern District of Michigan, Southern Division.

7. Defendant, SALAH HADWAN ("HADWAN") is a resident of a municipality that exists within the Eastern District of Michigan, Southern Division.

8. Defendant, JIHAN AIYASH ("AIYASH") is a resident of a municipality that exists within the Eastern District of Michigan, Southern Division.

9. Defendant, DAZ'SHAVON HALL ("HALL") is a resident of a municipality that exists within the Eastern District of Michigan, Southern Division.

10. The events giving rise to this case arose within the Eastern District of Michigan.

BACKGROUND FACTS

11. For all times material to this Complaint, Plaintiff has been employed by HPS.

12. Plaintiff started his employment with HPS under 6 years ago as an Instructional Facilitator.

13. In August 2019, Plaintiff entered into an Employment Agreement with HPS to be employed in the position known as ELL Services Director.

14. This position was also known as the ELD Director.

15. In this position, Plaintiff was a school administrator whose bargaining unit was represented by the union known as the Hamtramck Administrator's Association ("HAA").

16. Per the collective bargaining agreement ("CBA") between HPS and HAA, Plaintiff's employment was governed in part by the CBA and in part by a contract between HPS and Plaintiff.

17. Based on Michigan law and the CBA, Plaintiff's employment security was also subject to MCL 380.1229.

18. AHMED became the Superintendent of HPS starting with the 2019-2020 school year.

19. As such, AHMED was the chief administrative officer of the HPS.

20. In the Fall of 2019, HADWAN, AIYASH, and HALL were members of HPS' Board of Education ("Board").

21. The Board was and is HPS' legislative, governing body to which AHMED reported.

22. Meanwhile, Plaintiff reported to AHMED.

23. In the Fall of 2021, AHMED took a paid medical leave of absence after various controversies related to the handling of personnel and other matters arose.

24. Later, this medical leave of absence became a Board-required administrative leave of absence pending investigation.

25. In October 2021, Plaintiff became HPS' Interim Superintendent.

26. As such, Plaintiff was the chief administrative officer of the HPS.

27. However, per Plaintiff's Employment Agreement dated October 28, 2021, Plaintiff was also to continue to perform his ELD Director duties in addition to those he handled as Interim Superintendent.

28. Despite the extremely heavy workload, Plaintiff performed his duties both as Interim Superintendent and as ELD Director in an outstanding fashion.

29. Indeed, prior to AHMED's leave of absence, AHMED gave Plaintiff a highly effective performance rating for his performance as ELD Director.

30. For almost a year after Plaintiff started in the role of both Interim Superintendent and ELD Director, Plaintiff's tenure was not marked with the chaos, controversy, and instability of AHMED's tumultuous tenure as Superintendent.

31. Instead, Plaintiff's tenure during this period was notable in terms of his achievements and his excellent professional relationship with the Board, including HADWAN, AIYASH, and HALL.

32. Yet, during this period, AHMED commenced litigation against HPS, its teachers' union, and several Board members, including HADWAN.

33. Prior to January 2022, HADWAN violated Board policy by authorizing the hiring of his cousin by HPS.  This cousin is hereafter referred to as "Ms. W. A."

34. In or around January 2022, Ms. W. A. was a VLI Data Specialist.

35. Although human resource matters required privacy and Ms. W. A.'s duties were unrelated to human resources, Ms. W. A. was moved into the same office with the then H.R. Specialist who was being promoted to H.R. Director, namely "Mr. M. E."

36. In August 2022, Ms. W. A. had no experience in human resources, limited experiences in schools, and no degrees nor education relevant to human resources.

37. Despite this, Mr. M. E., who became the H.R. Director before August 2022, promoted Ms. W. A. to the H.R. Specialist position in August 2022.

38. Thus, Ms. W. A. then reported directly to Mr. M. E.

39. In August 2022, another HPS administrator had disclosed to Plaintiff in a private conversation that he had concerns regarding an ongoing, inappropriate relationship between Mr. M. E. and Ms. W. A.

40. This administrator said that he told Mr. M. E. that he should be ashamed of what he was doing with Ms. W. A.

41. This administrator's concerns echoed those of others that suggested an ongoing, inappropriate relationship between Ms. W.A. and Mr. M. E.

42. Plus, Plaintiff also had his own concerns.

43. After Ms. W. A. was promoted, Plaintiff walked into Mr. M. E.'s office on occasion to find Ms. W. A. cutting fruits for Mr. M. E. at Mr. M. E.'s desk or reclining in Mr. M. E.'s office chair with her feet on his desk.

44. Consistent with his authority as Interim Superintendent, Plaintiff moved individuals' offices and locations within Central Office to remove the appearance of improprieties between Mr. M. E. and Ms. W. A.

45. Thereafter, HADWAN sent inappropriate messages to Plaintiff attempting to intervene on Mr. M. E. and Ms. W. A.'s behalf, it being

inappropriate for Board members to interfere with such administrative and personnel matters.

46. Also, thereafter, Mr. M. E. remained disrespectful to others, was disengaged in meetings, refused to reply to emails, and/or responded to concerns with "that's not my department/job".

47. Up through October 5, 2022, Plaintiff became aware of additional information provided by HPS employees showing an inappropriate, intimate relationship between Mr. M. E. and Ms. W. A. as well as serious allegations of sexual harassment.

48. Among other things, these employees noted:

(a) Mr. M. E. and Ms. W. A. exited the administrative building, entered Ms. W. A.'s SUV, and engaged in inappropriate behaviors for nearly 30 minutes.

(b) Ms. W. A. engaged in sexually explicit conversations regarding her sex life or lack thereof with her husband and disclosed on another occasion that Mr. M. E. was in another office crying, because she broke up with him to work things out with her husband.

49. As HPS Civil Rights Coordinator, Plaintiff decided to press forward with an investigation into the allegations as well as to enact disciplinary measures against Mr. M. E. for his increased brazenness and insubordination as well as his reckless and inappropriate conduct.

50. As part of this, Plaintiff forwarded the information and complaints he received to HPS' District Compliance Officers and requested them to complete a Title IX investigation.

51. Also as part of this, Plaintiff suspended Mr. M. E. with pay pending an investigation.

52. After Plaintiff suspended Mr. M. E., HADWAN ordered Plaintiff to reinstate Mr. M. E. immediately.

53. HADWAN also indicated that he would submit retaliatory actions to the Board against Plaintiff.

54. Further, HADWAN said he had most of the Board's approval to place Plaintiff on administrative leave.

55. Plaintiff did not reinstate Mr. M. E.

56. Instead, he continued to pursue the internal investigation as alluded to above.

57. Further, as a private citizen and outside of his duties as an employee of HPS, Plaintiff decided that he had to take this matter and another matter to a higher level.

58. Specifically, during the evening of October 5, 2022 and early morning of October 6, 2022, Plaintiff made two (2) complaints to federal law enforcement agencies regarding issues with HPS.

59. First, Plaintiff submitted a written complaint to the Office of Civil Rights of the U.S. Department of Education ("OCR").

60. The OCR complaint addressed the sexual harassment and sexual improprieties issues alluded to and described above.

61. Second, Plaintiff submitted a written complaint to the Office of Inspector General which is believed to be part of the U.S. Department of Health and Human Services ("OIG").

62. The OIG complaint was a request for investigation into the misuse and diversion of public funds by HPS employees and contractors.

63. Given the nature of this investigation and since the investigation is ongoing, Plaintiff is only providing a limited summary of this complaint.

64. However, the OIG complaint pertained to the improper use of public school money to fund private schools, bribery, and possible money laundering.

65. Details and information were provided as part of the OIG complaint.

66. After submitting the OCR and OIG complaints to the OCR and OIG respectively, Plaintiff also forwarded them or the substance of them to all members of the Board.

67. On October 6, 2022, Mr. M. E. showed up to work based on HADWAN's direction.

68. Due to HADWAN's improper injection of himself into this personnel matter, Plaintiff had to contact the Hamtramck Police Department ("HPD") to report this trespass.  Mr. M. E. left the premises although the police said he could return the next day.

69. On October 7, 2022, and again based on HADWAN's direction, Mr. M. E. showed up at work.

70. Once again, Plaintiff had to contact the HPD to report the trespass.

71. This time the police corrected their response, acknowledged that HADWAN acted outside his authority, and advised Mr. M. E. to leave.

72. During this period from October 5, 2022 through October 7, 2022, HADWAN sent Plaintiff a multitude of text messages concerning Mr. M. E., but also directed Plaintiff not to take personnel actions and to send HADWAN emails regarding personnel matters.

73. Because HADWAN's directions were outside the scope of his authority as an individual Board member and were inconsistent with the authority granted to Plaintiff as Interim Superintendent, Plaintiff did not follow HADWAN's directions on these matters in general.

74. Further, Plaintiff received further information related to the sexual harassment and sexual impropriety issues concerning Mr. M. E. and Ms. W. A.

75. The substance of this information was forwarded to Board members as alluded to or described in paragraph 66 above.

76. While HADWAN's hostility toward Plaintiff for taking actions related to the Mr. M. E./Ms. W. A sexual harassment/improprieties investigation was evident contemporaneous to October 5, 2022, HADWAN's hostility and bias against the Plaintiff increased as Plaintiff engaged in and/or informed the Board of information related to this investigation, Plaintiff's complaint to the OCR, Plaintiff's complaint to the OIG, and/or Plaintiffs calls to the HPD.

77. In addition to threats to put Plaintiff on suspension/administrative leave, HADWAN took the following actions showing his hostility and bias against the Plaintiff:

(a) He had Plaintiff investigated by an outside law firm without approval of the Board as a body.

(b) He approached two individuals on separate occasions, asking each if he would like to become the Interim Superintendent.

(c) He allowed individuals hostile to the Plaintiff to improperly speak at an inappropriate time during a Board meeting to ambush the Plaintiff.

(d) He told a person that he had hired the lawyers to fire Plaintiff.

(e) He attempted to have the Board improperly evaluate the Plaintiff at the wrong time and contrary to his Interim Superintendent agreement.

78. After the outside law firm completed its investigation of the Plaintiff in December 2022, the investigation presumably did not reveal anything supporting Plaintiff's removal since he was <u>not</u> removed as Interim Superintendent at that time.

79. Yet, in January 2023, the Board and the individual Defendants who were and are Board members discussed removing Plaintiff as Interim Superintendent by either (A) making AHMED the Interim Superintendent or (B) hiring an unidentified, but known to Board members, individual as the Interim Superintendent.

80. AIYASH actually told the Plaintiff that this was "nothing personal" and that Plaintiff "did a good job".

81. On February 22, 2023 (while Plaintiff was off work due to the death of his nephew), the Board passed a motion or resolution reinstating AHMED and effectively terminating Plaintiff's employment as Interim Superintendent thus reducing his compensation and diminishing the terms and conditions of his employment.

82. On March 23, 2023, AHMED met with Plaintiff and told him that she was going to seek to have his administrator contract non-renewed.  This was confirmed by a letter of the same date.

83. Yet, this action was unjustified since Plaintiff's performance as the ELD Director had been outstanding.

84. Further, also on March 23, 2023, AHMED met with the Plaintiff and told him that he was being put on administrative leave until further notice to investigate him with respect to the investigation that had been previously completed in December 2022.  This was confirmed by a letter of the same date.

85. Of course, this also was unjustified since Plaintiff had already been previously cleared based on the completed investigation.

86. Given the lack of justification for these actions and the course of events, these actions were clearly taken in retaliation for Plaintiff's protected actions in October 2022.

87. On information and belief, these actions were also taken based on communications between the individual Defendants as reflected by events occurring after March 23, 2023.

88. For example, while the Board as a body rejected the non-renewal of Plaintiff's administrative contract, HADWAN, AIYASH, and HALL voted in favor of non-renewal despite the lack of justification for it.

89. Moreover, despite the purported investigation of Plaintiff's participation in the completed and when it occurred timely investigation, Plaintiff remains off on

administrative leave, has not been given any indication of when he may return (if ever), and has not been interviewed as part of this purported investigation.

90. Indeed, for all intents and purposes, this purported investigation just appears to be a sham that is being used to try to justify Plaintiff's absence from HPS until he resigns out of frustration, anger, anxiety, or humiliation.

91. Plaintiff's speech, statements, communications, associations, and/or actions were on or related to matters of a public concern where they were or concerned Plaintiff's OCR complaint, Plaintiff's OIG complaint, the investigation of sexual improprieties and/or sexual harassment related to Mr. M. E. and Ms. W. A., and/or reports to the HPD.

92. Further, by virtue of the same speech, statements, communications, associations, and/or actions, the Plaintiff did report violations or suspected violations of law to one or more public bodies, including all of the Defendants other than AHMED.

93. Moreover, Plaintiff's speech, statements, communications, associations, and/or actions related to the OCR complaint and investigation of sexual improprieties and/or sexual harassment related to Mr. M. E. and Ms. W. A. constitute things that are protected by Section 701 of Michigan's Elliott-Larsen Civil Rights Act.

94. The Defendants subjected the Plaintiff to adverse actions including, but not necessarily limited to, the following:

(a) Termination from the Interim Superintendent position;

(b) Imposition of an untimely, involuntary administrative leave to purportedly investigate Plaintiff again when he was already cleared by the prior investigation; and/or

(c) Harassment and retaliation, especially by HADWAN starting in or around September 2022 and continuing until Plaintiff's termination from the Interim Superintendent position.

95. The Defendants subjected the Plaintiff to the above adverse actions in significant part due to the Plaintiff's above speech, statements, communications, associations, and/or actions that were protected under the United States Constitution and the laws of the United States and the State of Michigan.

96. Therefore, the adverse actions taken against the Plaintiff by the Defendants were contrary to the United States Constitution and the laws of the United States of America and the State of Michigan.

## COUNT I: DEPRIVATION OF THE PLAINTIFF'S FEDERAL CIVIL RIGHTS AS TO ALL DEFENDANTS

97. The Plaintiff incorporates paragraphs 1 through 96 above by reference.

98. This Count is brought pursuant to 42 USC 1983.

99. The adverse actions taken by the Defendants against the Plaintiff as noted above were taken under color of state law.

100. The adverse actions stemmed from purposeful discrimination, purposeful retaliation, and/or from HPS' policy(ies) and/or custom(s).  This includes, but is not necessarily limited to, actions taken by the individual Defendants and/or the Board as HPS' final policymaker(s) for purposes of establishing HPS' policy(ies) and/or custom(s).

101. The adverse actions violated the Plaintiff's First Amendment rights to freedom of association, to freedom of speech and/or expression, and/or to petition government for the redress of grievances in that they were made in significant part due to the Plaintiff's statements, actions, and/or activities that were protected under the First Amendment.

102.   As a direct and proximate result of the Defendants' violations of the Plaintiff's rights, Plaintiff has sustained damages including (but not necessarily limited to) the following:

(a)  Loss of income;

(b)  Loss of fringe benefits;

(c)  Loss of pension and/or Social Security benefits;

(d)  Severe mental anguish and distress;

(e)  Embarrassment and humiliation;

(f)  Mental anguish stemming from the outrage he experienced

as a result of the actions against him;

(g)  Fright, shock, and mortification;

(h)  Pain and suffering;

(i)  Damage to reputation;

(j) Liquidated damages;

(k) Punitive damages; and

(l)  Costs and attorney fees.

WHEREFORE, your Plaintiff respectfully requests this Honorable Court to

enter a judgment in his favor against the Defendants, jointly and severally,

awarding him an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars

to which he is entitled for compensatory, exemplary, liquidated, and punitive

damages; granting him equitable relief; and awarding him costs, interest, and

attorney fees so wrongfully incurred.

<u>COUNT II: VIOLATION OF RIGHTS UNDER THE WHISTLEBLOWERS'
PROTECTION ACT AS TO ALL DEFENDANTS</u>

103. The Plaintiff incorporates paragraphs 1 through 102 above by

reference.

104. Under the Whistleblowers' Protection Act ("WPA"), the Defendants

were and/or are "employers" for all times material to this Complaint.

105. Under the WPA, each Defendant was also a "public body" for all times

material to this Complaint.

106. Under the WPA, the Plaintiff was an "employee" for all times material to this Complaint.

107. The adverse actions taken by the Defendants against the Plaintiff as noted above were taken in significant part due to the Plaintiff's report(s) of violations or suspected violations of the law to at least one public body.

108. The Defendants thus violated the WPA.

109. As a direct and proximate result of the Defendants' violations of the Plaintiff's rights, Plaintiff has sustained damages including (but not necessarily limited to) the following:

    (a) Loss of income;

    (b) Loss of fringe benefits;

    (c) Loss of pension and/or Social Security benefits;

    (d) Severe mental anguish and distress;

    (e) Embarrassment and humiliation;

    (f) Mental anguish stemming from the outrage he experienced as a result of the actions against him;

    (g) Fright, shock, and mortification;

    (h) Pain and suffering;

    (i) Damage to reputation;

(j) Liquidated damages;

(k) Punitive damages; and

(l)  Costs and attorney fees.

WHEREFORE, your Plaintiff respectfully requests this Honorable Court to enter a judgment in his favor against the Defendants, jointly and severally, awarding him an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars to which he is entitled for compensatory, exemplary, liquidated, and punitive damages; granting him equitable relief; and awarding him costs, interest, and attorney fees so wrongfully incurred.

## COUNT III:  RETALIATION IN VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT

110.  Plaintiff incorporates paragraphs 1 through 109 above by reference.

111. Each Defendant was a "person" within the meaning of the Elliott-Larsen Civil Rights Act ("ELCRA").

112. The Defendants violated Section 701 of the ELCRA, specifically MCL 37.2701(a) and (f), by taking the adverse actions they did against the Plaintiff as described above.

113. The Defendants violated the ELCRA by taking the adverse actions against the Plaintiff as described above in significant part because (a) he had engaged in the above protected activity and/or (b) in order to interfere with his exercise or enjoyment of rights granted by the ELCRA.

114. As a direct and proximate result of the Defendants' violations of the Plaintiff's rights, Plaintiff has sustained damages including (but not necessarily limited to) the following:

(a)  Loss of income;

(b)  Loss of fringe benefits;

(c)  Loss of pension and/or Social Security benefits;

(d)  Severe mental anguish and distress;

(e)  Embarrassment and humiliation;

(f)  Mental anguish stemming from the outrage he experienced as a result of the actions against him;

(g)  Fright, shock, and mortification;

(h)  Pain and suffering;

(i)  Damage to reputation;

(j)  Liquidated damages;

(k)  Punitive damages; and

(l)  Costs and attorney fees.

WHEREFORE, your Plaintiff respectfully requests this Honorable Court to enter a judgment in his favor against the Defendants, jointly and severally, awarding him an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars to which he is entitled for compensatory, exemplary, liquidated, and punitive

damages; granting him equitable relief; and awarding him costs, interest, and

attorney fees so wrongfully incurred.

DEMAND FOR TRIAL BY JURY IS HEREBY MADE.

DATED: May 19, 2023          /s/ GARY T. MIOTKE_____
                             GARY T. MIOTKE (P41813)
                             Attorney for Plaintiff